# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| PAYTON COLIN THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:12-00929 |
| | ) | Judge Nixon |
| v. | ) | Magistrate Judge Griffin |
| | ) | |
| MEHARRY MEDICAL COLLEGE, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Defendant Meharry Medical College's Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss"). (Doc. No. 8.) Also pending before the Court is Plaintiff Payton Colin Thomas's Motion for Partial Summary Judgment (Doc. Nos. 13; 25), Defendant's Motion to Strike Plaintiff's Summary Judgment Proof and for Attorneys' Fees ("Motion to Strike") (Doc. No. 52), Motion to Dismiss for Failure to Comply with this Court's Rules ("Second Motion to Dismiss") (Doc. No. 54),[1] and Motion to Ascertain Status of Motion to Dismiss for Failure to Comply With This Court's Rules and for Failure to State a Claim for Which Relief can be Granted ("Motion to Ascertain Status") (Doc. No. 61).

For the reasons given below, Defendant's Motion to Dismiss is **GRANTED** and this case is **DISMISSED**. As a result, Plaintiff's Motion for Partial Summary Judgment, Defendant's Second Motion to Dismiss, and Defendant's Motion to Ascertain Status are **TERMINATED AS MOOT**. Defendant's Motion to Strike is **TERMINATED AS MOOT** as it relates to Defendant's request that the Court strike Plaintiff's summary judgment proof. The Court

---

[1] Plaintiff has also filed a Motion to Strike Defendant's Motion to Strike Plaintiff's Summary Judgment Proof and for Attorney's Fees. (Doc. No. 56.) The Court treats this as a response to Defendant's Motion to Strike rather than as a separate motion.

1

**DIRECTS** Plaintiff to respond to Defendant's argument in its Motion to Strike regarding Defendant's request for attorney's fees within thirty days of this Order.

## I.    BACKGROUND

### A. Factual Background[2]

Plaintiff Payton Colin Thomas enrolled as a graduate student at Meharry School of Dentistry in June 2008. Meharry School of Dentistry ("SOD") is a division of Defendant Meharry Medical College, which is a Tennessee non-profit corporation that receives federal funding. Plaintiff was a student in a four-year dentistry program at the SOD from which he was scheduled to graduate in May 2012. As part of the dentistry program, Plaintiff's fourth year curriculum required him to work as a student doctor in the SOD's dental clinic, for which Plaintiff was paid. All dental students in the clinic were required to maintain a ninety percent attendance record in order to graduate. (Doc. No. 1-2 at 2.)

Plaintiff alleges that on September 13, 2011, he was alone in the restorative clinic with Dr. Suzette Stines, a female faculty member of the SOD, when she "grabbed [Plaintiff] around the neck in a choking hold and pull[ed Plaintiff] by the neck into the adjoining auxiliary room . . . ." (Doc. No. 1-1 at 7.) Plaintiff further alleges,

> Dr. Stines began verbally and physically scolding me about working with the other instructor who she said, "doesn't know anything about anterior composite restorations." I was very reluctant and attempted to pry her arms away from my neck as she grabbed tighter to make a point of reprimand. . . . Dr. Stines grabbed by [sic] neck and pulled me closer to her face as she pointed her finger in my face. She began to state as she was pointing in my face, "you know better than letting Dr. Smith help you with this case. You should know that He [sic] knows nothing about anterior aesthetic composite restorations." . . . She then

---

[2] All facts are drawn from Plaintiff's Complaint (Doc. No. 1), and attached exhibits (Doc. Nos. 1-1 to 1-4) unless otherwise noted. For clarity, the Court cites to the exhibits when facts are drawn from them.

> would proceed to insult and abuse me first by grabbing me
> inappropriate [sic] and choking me and also by insulting Dr. Smith.

(*Id.*) Plaintiff alleges that immediately following the altercation Dr. Stines stated "I need to

know that you are not going to say anything about this to anyone." (*Id.*)

Plaintiff states he was astonished and frightened by the incident but did not immediately

report Dr. Stines out of fear that she would retaliate against him by disrupting his academic

progress. Instead, Plaintiff avoided Dr. Stines and informed certain students, family members,

and faculty members about the incident, without naming Dr. Stines as the perpetrator. Plaintiff

states that, at his mother's suggestion, he later reported the incident to Dr. Ethel Harris, Dean of

Clinical Affairs; Dr. Cynthia Hodge, Dean of Academic and Student Affairs; and Dr. Gibson

Johnson, Chairman of Oral and Diagnostic Sciences, again without naming the perpetrator.

Harris, Hodge, and Johnson all advised Plaintiff to make an official report, but Plaintiff alleges

he did not follow their advice because he was afraid that reporting Dr. Stines would jeopardize

his graduation.

Plaintiff experienced severe anxiety as a result of the incident, both because he had a

history of being abused as a child and because he was concerned about how the incident would

affect his studies at the SOD. Plaintiff alleges he suffered an anxiety attack that caused him to be

hospitalized over Thanksgiving in 2011, and that he was forced to seek medical attention for his

anxiety on or about February 2, 2012. (Doc. No. 1-4 at 2.) Plaintiff further states that after the

altercation with Dr. Stines, his anxiety and emotional issues caused him to miss clinic shifts on

certain days. (Doc. No. 1-1 at 8.)

Early in Plaintiff's Spring 2012 semester, he passed the National Board of Dental

Examiners, Part I and II examinations, and was accepted into a post-graduate residency program

in Pediatric Dentistry at Lutheran Medical Center in Bangor, Maine, pending his graduation from

3

the SOD. By this time Plaintiff states he was aware that he had fallen behind in meeting his SOD clinical requirements, so he approached several of his professors and department chairs to formulate plans to ensure he could timely meet his graduation requirements. (*Id.*)

Plaintiff states the chairman of the Restorative Dentistry program, Dr. James Tyus, suggested Plaintiff attend a training course with Dr. Stines and then work under her to complete two of the eleven fixed prosthodontic units he needed to complete prior to graduation. (*Id.*) Plaintiff attended Dr. Stines's training session in April 2012, and then began working to complete his units. (*Id.*) Plaintiff states that on April 16, 2012, he asked Dr. Stines to evaluate his preparations, at which time he states the following exchange took place:

| | |
|---|---|
| Plaintiff: | "Dr. Stines would you evaluate my preparations for the Cerac modulation?" |
| Dr. Stines: | "Well how many crowns have you done?" |
| Plaintiff: | "none, that's why I am here." |
| Dr. Stines: | "well how many do you need to graduate?" |
| Plaintiff: | "Eleven." |
| Dr. Stines: | "well once you get nine, then you can come back to me for help. I'm not going to waste my time on someone that's not graduating. This exercise was intended only for those students anyway." |
| Plaintiff: | "well Dr. Stines I was told to see you specifically by the restorative department chairman Dr. Tyus to help meet my requirement. I was present at the training just like everyone else that needs crowns. I don't understand why you won't evaluate my preps." |
| Dr. Stines: | "Well, I'm not wasting my precious time on someone that won't be graduating." |

(Doc. No. 1-1 at 9.) Plaintiff alleges that Dr. Stines's statements amounted to "classic sexual harassment, sexual discrimination and retaliation," motivated by his telling other faculty and administrators about the September 13 incident, even though he had not named Dr. Stines in his

reports. Following the April 16 encounter with Dr. Stines, Plaintiff filed a formal written complaint with Dr. Harris against Dr. Stines for sexual harassment. Plaintiff alleges Dr. Harris neither timely processed or responded to his complaint. Plaintiff states that after filing the complaint, he continued working towards meeting his clinical requirements for graduation.

On May 7, 2012, SOD Dean Janet Southerland convened a meeting of the Meharry Student Evaluation and Academic Performance Committee ("SEAPC"), at which time she raised the issue of Plaintiff's attendance issues beginning in November 2011. Plaintiff alleges that, although Dr. Hodge and two other professors at the meeting disputed Dr. Southerland's statements regarding Plaintiff's clinical attendance, Dr. Southerland moved to have the SEAPC require Plaintiff to obtain a medical evaluation to determine whether he was medically fit to continue participating in the SOD and then repeat his final year in the program based on his poor attendance record.

The Committee passed the motion the same day, and Dr. Southerland immediately called a meeting with Plaintiff and four other Meharry officials to inform Plaintiff of its decision. At the meeting, Plaintiff alleges Dr. Southerland explained that based on Plaintiff's clinical attendance records he would either be dismissed or have to repeat his last year at the SOD in order to graduate. Plaintiff responded by disputing Dr. Southerland's claim that he had not adequately attended his clinics and argued that Dr. Southerland was prohibiting him from performing his clinical duties in retaliation for reporting Dr. Stines's sexual harassment.

On May 9, 2012, Plaintiff drafted a letter to Dr. Wayne Riley, president of Meharry Medical College, detailing the events that transpired beginning in September 2011, outlining the potential damages he had suffered, and requesting Dr. Riley excuse him from completing his

5

clinical requirements so that he could graduate with his class in May 2012.[3] (Doc. No. 1-1 at 5–12.) Plaintiff sent Dr. Riley several follow-up emails but alleges he received no response from Dr. Riley other than a letter on June 8, 2012, stating that the matter was being investigated by the SOD Student Disciplinary Committee.

On May 16, 2012, Dr. Southerland sent Plaintiff a letter stating that he would not be allowed to participate in the May 19, 2012, commencement ceremony because he had "failed to meet the necessary classroom and/or clinic attendance policy." Dr. Southerland stated that as of May 16, 2012, Plaintiff had only completed twenty-three percent of the mandatory clinical attendance required for graduation and that she had forwarded the matter to the SOD Student Disciplinary Committee with a recommendation that Plaintiff be dismissed from the SOD for violating school policy regarding professional conduct. (Doc. No. 1-2 at 2.)

On August 9, 2012, the SOD Student Disciplinary Committee requested Plaintiff appear at a hearing on August 13, 2012, to determine whether he should be dismissed from the dentistry program. Plaintiff responded that he was unable to be present on that date, and the hearing was rescheduled for August 23, 2012. (Doc. No. 1-3 at 2.) Plaintiff did not appear at the rescheduled hearing. *Id.* In a letter dated August 31, 2012, Jacqueline Gardner, Chair of the Student Disciplinary Committee, informed Plaintiff that at the August 23, 2012, hearing, conducted *in absentia*, the Committee determined Plaintiff had submitted fraudulent documentation to excuse his clinical absences between November 28, 2011, and May 7, 2012. (*Id.*) The Committee recommended Plaintiff undergo a psychological evaluation to determine whether he was

---

[3] It is unclear from Plaintiff's Complaint and related filings whether Plaintiff sent Dr. Riley the letter on May 9, 2012. In an email Plaintiff sent to Dr. Riley, date-stamped May 17, 2012, Plaintiff stated that the May 9 letter was attached to the email, and that he had also sent the May 9 letter to Dr. Southerland on May 14, 2012. (Doc. No. 1-1 at 3.) It is clear that Dr. Riley received the May 9 letter on or before May 17, 2012.

mentally competent to continue in the SOD program, prior to it making a final disciplinary decision. (*Id.*)

### B. Procedural Background

On September 11, 2012, Plaintiff filed a Complaint, bringing four claims: (1) violation of his rights under Title IX; (2) violation of his rights under the Tennessee Human Rights Act ("THRA"); (3) breach of contract; and (4) breach of the duty of good faith and fair dealing. (Doc. No. 1.) On October 22, 2012, Defendant filed a Motion to Dismiss (Doc. No. 8), with a Memorandum in Support (Doc. No. 9). Plaintiff filed a Response on November 5, 2012 (Doc. No. 14), to which Defendant filed a Reply on December 3, 2012 (Doc. No. 29).

Plaintiff also filed a Motion for Partial Summary Judgment on November 5, 2012 (Doc. No. 13), with a Memorandum in Support (Doc. No. 14), a Concise Statement of Material Facts for which there is no Genuine Issue for Trial (Doc. No. 15), and two exhibits (Doc. Nos. 16; 19-1). Defendant filed a Response in Opposition on December 14, 2012 (Doc. No. 32), with a Response to Plaintiff's Concise Statement of Facts (Doc. No. 36), and several exhibits (Doc. Nos. 33; 33-1 to 33-13; 34; 35). On January 7, 2013, Plaintiff's attorney filed a Motion of Counsel to Withdraw (Doc. No. 38), which the Court granted on March 11, 2013 (Doc. No. 42). Subsequently, on June 12, 2013, Plaintiff filed, proceeding *pro se*, filed a Reply in support of his Motion for Partial Summary Judgment. (Doc. No. 57.)

On May 24, 2013, Defendant filed a Motion to Strike (Doc. No. 52) and a Second Motion to Dismiss (Doc. No. 54), along with supporting memoranda (Doc. Nos. 53; 55). Plaintiff filed a Response opposing the Motion to Strike on June 12, 2013. (Doc. No. 56.)

## II.   LEGAL STANDARD

To withstand a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Supreme Court has clarified the *Twombly* standard, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that pleads facts "'merely consistent with' defendant's liability . . . 'stops short of the line between possibility and plausibility' of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557 (internal brackets omitted)).

When ruling on a defendant's motion to dismiss, the court must "construe the complaint liberally in the Plaintiffs' favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). The court should allow "a well-pleaded complaint [to] proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556. However, a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Id.* at 555. "'[A] legal conclusion couched as a factual allegation' need not be accepted as true on a motion to dismiss," *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citation omitted), and mere recitation of the elements of a cause of action "or an "unadorned, the-defendant-unlawfully-harmed-me accusation" will not do, *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. While the court must accept "as true all non-conclusory

8

allegations in the complaint," *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009), it does not have to accept unsupported legal conclusions, *Iqbal*, 556 U.S. at 678.

Additionally, while the court will not generally consider matters outside of the pleadings when ruling on a motion to dismiss, "the court may . . . consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005). Any "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

## III. ANALYSIS

Defendant argues Plaintiff's Complaint fails to state a claim upon which relief can be granted for each of Plaintiff's claims. First, Defendant argues Plaintiff's Title IX and THRA claims are not adequately plead because Plaintiff fails to allege any facts showing he was subjected to conduct based on his sex or requests for sexual favors. (Doc. No. 9 at 5–16.) Next, Defendant argues Plaintiff fails to state a claim for breach of contract because Plaintiff's allegations do not identify a binding obligation on Defendant. (*Id.* at 14–15.) Finally, Defendant argues that, because Plaintiff's breach of contract claim fails, his breach of the duty of good faith and fair dealing cannot survive as an independent cause of action. (*Id.* at 15.) Plaintiff responds that his Complaint satisfies the pleading standard to defeat Defendant's Motion on all counts. (Doc. No. 14 at 16–20.) The Court analyzes Defendant's arguments as to each of Plaintiff's claims in turn.

*A. Title IX and THRA Claims*

Title IX of the Education Amendments of 1972 provides in pertinent part "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2012). The Supreme Court first held that an implied private right of action exists for victims of sexual discrimination under Title IX in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), and has since determined that a plaintiff may seek monetary damages under Title IX. *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992). The Supreme Court later recognized that an independent cause of action exists for retaliation following a plaintiff's reporting Title IX discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179–81 (2005). However, "only recipients of federal funds may be liable for damages under Title IX." *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999).

The stated purpose of the THRA is, in part, to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972." Tenn. Code Ann. § 4-21-101(a)(1) (2013). In interpreting the statutory language of the THRA, the Tennessee Supreme Court held that discrimination and retaliation under the THRA and the federal civil rights statutes are to be analyzed under the same framework. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996). Accordingly, the Court applies its analysis of Plaintiff's Title IX claims to his THRA claims as well. *See Webb v. Wilson Cnty. Bd. of Educ.*, No. 3:05CV0214, 2006 WL 626188, at *6 (M.D. Tenn. Mar. 10, 2006) (applying its analysis of the plaintiff's Title IX discrimination claim to her THRA discrimination claim).

Plaintiff raises claims for both sexual harassment/discrimination and retaliation under Title IX.

1.  Title IX Discrimination

A plaintiff must allege the following elements to proceed on a Title IX claim against an educational institution:

> [(1)] she was subjected to *quid pro quo* sexual harassment or a sexually hostile environment; [(2)] she provided actual notice of the situation to an 'appropriate person,' who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and [(3)] the institution's response to the harassment amounted to 'deliberate indifference.'"

*Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001). Courts analyze Title IX discrimination and retaliation claims under the same legal framework utilized for analogous Title VII claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013) (citing *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007) ("Generally, courts have looked to Title VII, 42 U.S.C. §§ 2000e, as an analog for the legal standards in both Title IX discrimination and retaliation claims.")). The parties dispute whether Plaintiff adequately alleged the first and third elements of his Title IX discrimination claim. Accordingly, the Court addresses these two elements in turn.

### i. *Quid Pro Quo* Sexual Harassment

To establish a *quid pro quo* sexual harassment/discrimination claim, a plaintiff must allege:

> (1) that [he or she] was a member of a protected class; (2) that [he or she] was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that [his or her] submission to the unwelcomed advances was an express or implied condition for receiving [educational] benefits or that [his or her] refusal to submit to the supervisor's sexual demands resulted in a tangible [educational] detriment; and (5) the existence of respondeat superior liability.

*Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986). The student carries the burden to allege facts that "support charges that submission to the unwelcomed sexual advances of [instructors] was an express or implied condition for receiving [educational] benefits or that a tangible [educational] detriment resulted from the [student]'s failure to submit to the sexual demands of [instructors]." *Id.*

Here, Defendant argues Plaintiff has not provided facts showing he was subjected to any sexual advances or requests for sexual favors, and thus has not alleged the elements necessary for a *quid pro quo* claim. (Doc. No. 9 at 5–6.) Plaintiff responds in a conclusory fashion that he has sufficiently alleged *quid pro quo* sexual harassment in paragraph 12 of Part III his Complaint but fails to address the specific elements of a *quid pro quo* claim. (Doc. No. 14 at 17.)

Plaintiff makes no allegation that he was subjected to unwelcome sexual advances or requests for sexual favors, or that the alleged conduct of Dr. Stines was based on Plaintiff's sex either in Part III, paragraph 12, or the remainder of the Complaint. Thus, the Court finds Plaintiff's allegations fail to establish the second, third, and fourth elements necessary for a *quid pro quo* sexual harassment claim. Courts have found plaintiffs failed to satisfy their burden to establish a prima facie claim of *quid pro quo* discrimination even where the behavior alleged was of a more strikingly sexual nature than that alleged in this case. *See e.g., Staton v. Miami Univ.*, 145 F.3d 1333, at *1 (6th Cir. 1998) (finding no prima facie case for *quid pro quo* discrimination where the plaintiff alleged that his department head instructing him to be nicer or friendlier to her amounted to a request for sexual favors); *Petrone v. Cleveland State Univ.*, 993 F. Supp. 1119, 1129 (N.D. Ohio 1998) (finding no *quid pro quo* harassment claim established despite the plaintiff alleging that her professor discussed his relationships with other women with the

plaintiff, gave her romantic poems, letters, and books, and asked her to go on walks and to dinner with him).

Plaintiff's Complaint and attached exhibits detail allegations of physical abuse and possible threats by Dr. Stines, but nothing sexual in nature. (*See* Doc. Nos. 1 Part III ¶¶ 5, 11; 1-1 at 7, 9.) Plaintiff's allegations may very well support a finding that Dr. Stines physically assaulted him ("[Dr. Stines] grabbed me around the neck in a choking hold and pull[ed] me by the neck into the adjoining auxiliary room") and refused to supervise some of his work ("[W]ell once you get nine, then you can come back to me for help. I'm not going to waste my time on someone that's not graduating"). (Doc. No. 1-1 at 7, 9.) However, Plaintiff does not allege any facts that allow the Court to infer that Dr. Stines made sexual advances towards Plaintiff or requested sexual favors from him. The Court is thus left with no factual basis to support a showing of the second element necessary for a *quid pro quo* claim.

The Court also finds Plaintiff has failed to allege he would receive specific educational benefits for submitting to, or suffer detriment if he did not submit to, unwanted sexual advances or requests for sexual favors. In addition to Plaintiff's failure to allege facts evincing anything sexual about the encounters between himself and Dr. Stines, Plaintiff does not argue that Dr. Stines made any offers to bestow an educational benefit on Plaintiff in return for tolerating unwanted sexual behavior. By Plaintiff's own account, the September 13, 2011, incident consisted of Dr. Stines physically assaulting Plaintiff and reprimanding him for getting assistance from a professor Dr. Stines felt was not qualified to supervise a certain dental procedure. (*See id.* at 7.) In addition, Plaintiff's description of the April 16, 2012, incident consisted exclusively of Dr. Stines refusing to supervise Plaintiff on clinical work until Plaintiff completed enough credits to show he would be able to graduate that spring. (*See id.* at 9.)

Accepting as true all of Plaintiff's allegations and making any permissible inferences, the Court finds Plaintiff has not met his burden to demonstrate that he would receive benefits for submitting to or would suffer detriment if he did not submit to sexual demands.

In addition to the Complaint's deficiencies with respect to the second and fourth elements of a *quid pro quo* claim, Plaintiff also failed to allege any facts indicating that the alleged harassment he endured was based on his sex. At no point in the Complaint does Plaintiff attempt to differentiate Defendant's treatment of male and female students. (*See, e.g.,* Doc. No. 1 Part III ¶ 17) ("The Plaintiff alleges that Dr. Stines [sic] act of prohibiting him from performing his clinical services in order to graduate is retaliation and/or sexual discrimination as defined herein because *similarly situated students* were permitted to complete their clinical requirements and thus graduate and receive their diploma [sic].") (emphasis added). Because Plaintiff fails to allege that any harassment he suffered was based on his sex, the Court finds Plaintiff cannot meet his burden to establish the third element necessary for a *quid pro quo* claim.

ii. Sexual Harassment Based on Sexually Hostile Environment

To establish a sexually hostile environment sexual harassment/discrimination claim, a plaintiff must allege:

> (1) [he or she] was a member of a protected class; (2) [he or she] was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with [his or her educational] performance and creating an intimidating, hostile, or offensive [educational] environment; and (5) the existence of respondeat superior liability.

*Highlander*, 805 F.2d at 649 (quoting *Rabidue v. Osceola Ref. Co.*, 805 F.2d 611, 619–20 (6th Cir. 1986), *abrogated on other grounds*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993));

14

*Garmon v. Cont'l Baking Co.*, 999 F.2d 539, at \*3 (6th Cir. 1993). In contrast to *quid pro quo*

claims—which may stem from a single incident—sexually hostile environment claims are

"characterized by multiple and varied combinations and frequencies of offensive exposures . . .

that place[] the burden upon the plaintiff to demonstrate that injury resulted not from a single or

isolated offensive incident . . . but from incidents . . . that occurred with some frequency."

*Rabidue*, 805 F.2d at 620. The behavior complained of must also be both objectively and

subjectively "based on sex, rather than personal animus or other reasons." *Johnson v. Galen*

*Health Insts., Inc.*, 267 F. Supp. 2d 679, 685 (W.D. Ky. 2003) (*citing Frazier v. Fairhaven Sch.*

*Comm.*, 276 F3d 52, 66 (1st Cir. 2002)). If the sexual conduct complained of would be equally

offensive to male and female students, it does not support a Title IX sexual harassment claim

because "both men and women were accorded like treatment." *Rabidue*, 805 F.2d at 620 (citing

*Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

Plaintiff argues that as of the moment he filed a sexual harassment claim against Dr.

Stines in April 2012, he suffered a sexually hostile work environment in that he was denied

access to clinics, did not receive his final grades, his diploma was withheld, and he ultimately

lost his offer of employment in a residency program. (Doc. No. 14 at 18.) However, Plaintiff

has not alleged sufficient facts showing he was subjected to any harassment of a sexual nature.

*See supra* Part III.A.2.i. Thus the Court finds he cannot fulfill the second element required for a

sexually hostile environment claim; exposure to unwelcome sexual harassment.

The Court further finds that Plaintiff has not met his burden to establish the fourth

element of a sexually hostile environment claim because he does not allege any causation

between the claimed sexual harassment and a sexually hostile environment. Plaintiff alleges

only two incidents that he claims amounted to sexual harassment, occurring on September 13,

2011, and April 16, 2012. (Doc. Nos. 1 Part III ¶¶ 5, 11; 1-1 at 7, 9.) However, Plaintiff contends that he was not subjected to a sexually hostile environment until after he filed a sexual harassment claim against Dr. Stines, *following* the April 16, 2012, incident. (Doc. No. 14 at 18.) Thus, during the time Plaintiff claims he began suffering a sexually hostile work environment, he does not allege any acts of sexual harassment were exacted upon him.

Lastly, the Court finds Plaintiff has failed to adequately allege the third element of a sexually hostile environment claim; harassment based on sex. The Complaint lacks any allegation that Defendant treated males and females differently, or that Dr. Stines had a particular sexual interest in him (*see supra* Part III.A.1.i), thus Plaintiff cannot prove that the alleged harassment was "based on sex, rather than personal animus or other reasons." *See Johnson*, 267 F. Supp. 2d at 685. As such, the claim fails at the third element in addition to its other fatal deficiencies.

### iii. Sufficiency of Defendant's Response to Claimed Sexual Harassment

Although Plaintiff's discrimination claim fails upon the Court's inquiry into the first element necessary under Title IX, the Court also finds Plaintiff has alleged facts sufficient to withstand Defendant's Motion to Dismiss regarding the third element—the adequacy of Defendant's response to Plaintiff's allegations. The third element of a Title IX discrimination claim requires the plaintiff to show that the defendant's response to learning of sexual harassment or a sexually hostile environment amounted to "deliberate indifference" to the discrimination. *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998). "The deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009) (quoting *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)) (internal

quotation marks and brackets omitted). A school is not required to "engage in particular disciplinary action to avoid title XI liability," *id.*, and "is liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment." *Vance*, 231 F.3d at 260.

Here, the Court finds Plaintiff makes no allegations of sexual harassment following his filing a formal sexual harassment report against Dr. Stines. In fact, Plaintiff does not allege he had any further contact with Dr. Stines after reporting the alleged harassment in April 2012. Although few facts exist in the record showing how Defendant responded to Plaintiff's report, because Plaintiff did not continue to experience sexual harassment once he put Defendant on notice of Dr. Stines's conduct, there is no basis to find Defendant's response to Plaintiff's sexual harassment report amounted to deliberate indifference. Plaintiff's Complaint fails to state a claim under both the first and third required elements of a Title IX discrimination claim. Accordingly Plaintiff's Title IX and THRA discrimination claims are **DISMISSED**.

    2.    Title IX Retaliation

Although not squarely addressed by the Sixth Circuit, courts have held that to establish a prima facie claim of Title IX retaliation a plaintiff must show:

> (1) that she engaged in protected opposition to . . . Title IX discrimination or participated in a . . . Title IX proceeding; (2) that plaintiff's exercise of her protected rights was known to the defendants; (3) that she was subjected to an adverse [educational] action subsequent to or contemporaneous with the protected activity; and (4) that there was a causal connection between the protected activity and the adverse [educational] action.

*Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 793 (S.D. Ohio 1998) (citing *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990), for the elements of a Title VII

retaliation claim, and holding that Title IX retaliation claims are analyzed identically), *aff'd*, 194 F.3d 1315 (6th Cir. 1999).

With respect to the first element of a retaliation claim, "[c]omplaints concerning unfair treatment in general which do not *specifically* address discrimination are insufficient to constitute protected activity." *Weaver*, 71 F. Supp. 2d at 793–94 (emphasis added); *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (applying the Title VII retaliation elements to an ADEA retaliation claim and finding that "in order for [the plaintiff's] comments to [a supervisor] to be deemed protected activity under the ADEA, [the plaintiff] must have referenced alleged acts of age discrimination by [the defendant]"); *Soehner v. Time Warner Cable, Inc.*, No. 1:08-cv-166, 2009 WL 3855176, at * 9 (S.D. Ohio November 16, 2009) ("[A] vague complaint that does not reference conduct made unlawful under [Title IX] is not protected activity"); *Porubsky v. Macomb Cmty. Coll.*, No. 10-13591, 2012 WL 2803765, at *11 (E.D. Mich. July 10, 2012) (finding the plaintiff failed to establish that he engaged in protected activity where he sought to appeal his grade but failed to demonstrate that the grade appeal was specifically related to a gender discrimination incident); *Pastura v. CVS Caremark*, No. 1:11-cv-400, 2012 WL 6738660, at *10 (S.D. Ohio Dec. 31, 2012) ("Vague charges that management is out to get the plaintiff are not opposition to an unlawful employment practice and do not constitute protected activity.")

Similar to the above-cited cases where courts have found the first element of a retaliation claim was not established, here there is no indication that Plaintiff's report to Dr. Harris contained any facts constituting sexual discrimination. As the Court has found Plaintiff's Complaint failed to allege sexual discrimination prohibited by Title IX, *see supra* Part III.A, his sexual harassment report does not qualify as "protected opposition to Title IX discrimination."

As such, Plaintiff's Complaint fails to meet the first requirement necessary to allege a Title IX or THRA retaliation claim and the claims are **DISMISSED**.

### B. Breach of Contract

In Tennessee, "[w]hen a plaintiff alleges breach of contract, he or she is responsible for proving (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach." *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006) (internal quotation marks omitted); *see also Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996).

Here, Plaintiff alleges Defendant "breached its contract with Plaintiff to provide him his graduate degree in dentistry after he had essentially earned it." (Doc. No. 1 Part IV ¶ 3.) Although Plaintiff points to no written contract binding Defendant to confer a degree upon him, the Sixth Circuit has determined that "the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area." *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988). Thus, although Defendant argues Plaintiff has failed to allege the existence of a valid or enforceable contract, the Court evaluates Plaintiff's claim assuming an implied student-university contractual relationship existed between the parties.

For implied contractual relationships between students and universities, "courts have adopted different standards of review when educators' decisions are based upon disciplinary versus academic criteria." *Id.* Federal courts are ill-suited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985); *see also Hutchings v. Vanderbilt Univ.*, 55 F. App'x 308, 310 (6th Cir. 2003) ("Courts are not inclined to review

19

educational malpractice claims or breach of contract claims based on inadequate educational services."). "This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession." *Doherty*, 862 F.2d at 576. On the other hand, disciplinary actions taken by universities are property reviewable by courts under a more "intrusive analysis." *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005) (finding a university's handling of its disciplinary process is subject to more stringent judicial review then its handling of academic decisions).

Based on the varying levels of review available to the Court, the ultimate question in the instant case is whether Defendant's decision to not allow Plaintiff to graduate was academic or disciplinary. Taking Plaintiff's allegations as true, the Court finds Defendant's decision to be academic as it was guided by Plaintiff's failure to meet clinical attendance requirements previously set forth by the SOD Academic Policies and Clinical Policy Manual. (*See* Doc. No. 1 Part III ¶ 16; 1-2 at 2.) As of less than one week before graduation, Plaintiff had completed only 23% of his mandatory clinical attendance, while SOD policy dictated that 90% clinical attendance was required to graduate. (Doc. No. 1-2 at 2.) Plaintiff was aware he had fallen behind, and requested a "pardon" from being held back for failure to complete clinical requirements. (Doc. No. 1-1 at 8, 10.) Despite Plaintiff's request, Defendant determined that Plaintiff should not participate in graduation or be awarded a degree because of the deficiencies in his work, and the Court finds it would be inappropriate to substitute its own judgment for Defendant's regarding whether Plaintiff had satisfied his graduation requirements. *See Ward v. Members of Bd. of Control of E. Mich. Univ.*, 700 F. Supp. 2d 803, 814 (E.D. Mich. 2010) ("A federal court should not override a 'genuinely academic decision . . . unless it is such a

substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" (quoting *Ewing*, 474 U.S. at 225) (internal quotation marks omitted)). The Court finds Plaintiff has not adequately alleged facts showing Defendant breached any contract with Plaintiff and as such Plaintiff's breach of contract claim is **DISMISSED**.

### C. *Breach of Duty of Good Faith and Fair Dealing*

In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013) (internal quotation marks and emphasis omitted). However, "[b]reach of the implied covenant of good faith and fair dealing is not an independent basis for relief." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003); *see also Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 894 (Tenn. Ct. App. 2000) (holding a claim for "'breach of [the] covenant of good faith and fair dealings,' . . . is not a cause of action in and of itself but [is] a part of a breach of contract cause of action.").

Because Plaintiff's breach of contract claim fails, no claim exists on which to base a claim for breach of the duty of good faith and fair dealing. Accordingly, this claim is **DISMISSED**.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion (Doc. No. 8) is **GRANTED** and this case is **DISMISSED**. By this Order, Plaintiff's Motion for Partial Summary Judgment (Doc. Nos. 13; 25), Defendant's Second Motion to Dismiss (Doc. No. 54), and Defendant's Motion to Ascertain Status (Doc. No. 61) are **TERMINATED AS MOOT**. Defendant's Motion to Strike (Doc. No. 52) is **TERMINATED AS MOOT** with respect to Defendant's request that the Court

strike Plaintiff's summary judgment proof. The Court **DIRECTS** Plaintiff to respond to the Motion to Strike, with respect to Defendant's argument that the Court should award it attorney's fees, within thirty days of this Order.

It is so ORDERED.

Entered this the 20 day of February, 2014.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT